IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | |
|---|---|
| DAVID AYERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF CLEVELAND, Cleveland Police Detectives MICHAEL CIPO and DENISE KOVACH, CUYAHOGA METROPOLITAN HOUSING AUTHORITY, Cuyahoga Metropolitan Housing Authority Sergeant DONALDSON and Police Officers RAYMOND MORGAN, THOMAS IMES, and CHRIS JAKUB, and Unknown City of Cleveland and Cuyahoga Metropolitan Housing Authority Employees, | ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | )  JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff, DAVID AYERS, by his attorneys, LOEVY & LOEVY, files this Complaint against Defendants CITY OF CLEVELAND, Cleveland Police Detectives MICHAEL CIPO and DENISE KOVACH, CUYAHOGA METROPOLITAN HOUSING AUTHORITY, Cuyahoga Metropolitan Housing Authority Sergeant DONALDSON and Police Officers RAYMOND MORGAN, THOMAS IMES, and CHRIS JAKUB, and Unknown City of Cleveland and Cuyahoga Metropolitan Housing Authority Employees, and states as follows:

**Introduction**

1. Plaintiff David Ayers spent nearly twelve years in prison for a murder that he did not commit. Arrested at the age of 43, he was wrongfully convicted and sentenced to life in prison for the murder of Dorothy Brown. Mr. Ayers's wrongful conviction rested solely on fabricated evidence and false testimony that Defendants falsified and coerced.

2. Based on new DNA testing and other evidence, Mr. Ayers was exonerated of this crime. Now exonerated, Mr. Ayers brings this lawsuit to redress the injustice that was inflicted upon him.

## Jurisdiction and Venue

3. This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

4. This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1367.

5. Venue is proper under 28 U.S.C. §1391(b). Plaintiff resides in this jurisdictional district and Defendants City of Cleveland and Cuyahoga Metropolitan Housing Authority are governmental bodies located here. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

## The Parties

6. Plaintiff David Ayers is 55 years old. He resides in Cleveland, Ohio. At the time of the wrongful conviction described herein, Mr. Ayers was working as a security officer for the Cuyahoga Metropolitan Housing Authority.

7. At all relevant times, Cleveland Police Department Detectives Michael Cipo, Denise Kovach, and as-yet Unknown Cleveland Police Department Officers were members of the Cleveland Police Department employed by Defendant City of Cleveland and working within the scope of their employment.

8. At all relevant times, Cuyahoga Metropolitan Housing Authority Sergeant Donaldson, Police Officers Raymond Morgan, Thomas Imes, Chris Jakub, and as-yet Unknown Cuyahoga Metropolitan Housing Authority employees were employed by Defendant Cuyahoga Metropolitan Housing Authority and acting within the scope of their employment.

9. Defendants Cipo, Kovach, Donaldson, Morgan, Imes, Jakub, and the Unknown City of Cleveland and Cuyahoga Metropolitan Housing Authority employees are herein referred to collectively as the "Individual Defendants."

10. Defendant City of Cleveland is a political subdivision of the State of Ohio that employs the Cleveland Police Department to enforce all city, state, and federal laws.

11. Defendant Cuyahoga Metropolitan Housing Authority ("CMHA") is a political subdivision of the State of Ohio that employs the CMHA Police Department to enforce all city, state, and federal laws, as well as CMHA policies and procedures.

**Background**

12. Mr. Ayers graduated high school in Cleveland in 1976 and worked there for the next two decades. Prior to this case, Mr. Ayers had never been arrested for a crime.

13. In December 1999, Mr. Ayers was working as a security officer for CMHA. CMHA owned and operated several residential buildings for the elderly and disabled. Mr. Ayers had worked for CMHA for almost eight years and lived in one of CMHA's buildings, where he performed community service and maintained a visible security presence in exchange for subsidized rent. Mr. Ayers was a familiar and welcome presence at the CMHA apartment buildings.

14. On the night of December 16, 1999, Mr. Ayers was working the late shift at another one of CMHA's apartment buildings. When he arrived home at his apartment building in the early morning hours of December 17, 1999, he received a call from one of the elderly residents in his building, Dorothy Brown. Ms. Brown had fallen in her apartment and asked him to come assist her. This was not an unusual call for Mr. Ayers to receive, and he agreed to help her.

15. Ms. Brown had also called Sarah Harris, a friend of hers who resided in the building, to ask for assistance.  Together, Mr. Ayers and Ms. Harris went to the lobby to get a key to Ms. Brown's apartment, which was kept in a lockbox.  They then went together to assist Ms. Brown.

16. After helping Ms. Brown up from her floor and into a chair, Mr. Ayers and Ms. Harris left the apartment.  Mr. Ayers locked the front door as they left and Ms. Harris accompanied him to the lockbox to return the key.  Mr. Ayers and Ms. Harris then parted ways and went back to their respective apartments.

17. When Mr. Ayers walked out of his apartment the next afternoon to go to work, he heard a commotion.  He then learned that Dorothy Brown was dead.

### The Murder

18. Ms. Brown had been violently murdered.  She was found lying on the floor in a pool of blood, naked from the waist down.

19. The Cuyahoga County Coroner's Office concluded that she died of more than twenty blunt impact blows to the head that fractured her skull, injured her brain and broke the left side of her face.  Ms. Brown also had defensive wounds on her body: scrapes and bruises on her arms and right shoulder, and abrasions on her face.  The perpetrator or perpetrators broke Ms. Brown's left ring finger and her right middle finger, likely while attempting to steal her rings.

20. In addition to being discovered partially nude, two pubic hairs were found in Ms. Brown's mouth.

21. Ms. Brown's apartment was ransacked.  Despite the abundance of physical evidence, the Cleveland Police Department failed to lift even a single fingerprint from the scene.

### The Immediate Aftermath

22. Mr. Ayers immediately went upstairs to find out what was happening. There he briefly observed blood covering the floor and the wall of Ms. Brown's apartment.

23. Distraught, Mr. Ayers went to a resident's apartment and used the phone to report the incident to his supervisor, pursuant to CMHA protocol. Then, in shock, Mr. Ayers returned to the hallway.

24. Cleveland Police Department ("CPD") officers, paramedics, and CMHA police officers swarmed the building. Mr. Ayers spoke with CPD Detective Michael O'Malley and informed him of Ms. Brown's fall the night before. Mr. Ayers recounted the entire incident, beginning with the call he received from Ms. Brown asking for assistance and ending with his replacing the key in the lockbox and heading to bed. Mr. Ayers believed he was being helpful by establishing that Ms. Brown was alive at approximately 2 a.m.

25. After he provided the information to Detective O'Malley, Mr. Ayers left to his job. When he returned home late that night, he was still feeling deeply upset by Ms. Brown's death. Mr. Ayers called his close friend, Ken Smith, for support.

### The Framing of Mr. Ayers

26. The CPD assigned two homicide detectives, Defendants Cipo and Kovach, as primary investigators on the case.

27. In the days following the murder, Defendants Cipo and Kovach, as well as other CPD officers, spoke with various residents of the apartment building and the victim's family members to attempt to identify the perpetrator or perpetrators. Although they received several leads, nothing panned out initially. In the weeks that followed, their investigation slowed.

5

28. Meanwhile, CMHA police officers decided to take matters into their own hands. On December 20, 1999, Defendant Imes called CPD to report his suspicions about a CMHA maintenance worker. Two days later, Defendant Imes again phoned the CPD. This time, he was calling to express his suspicions about Mr. Ayers. The CPD officer he spoke with described Defendant Imes's concerns as "sketchy at best" and disregarded them.

29. When Defendant Imes indicated that CMHA police were considering administering a polygraph test to Mr. Ayers, the CPD officer reminded him that the CPD Homicide Unit was in charge of the investigation and instructed Defendant Imes not to give Mr. Ayers – or anyone else – a polygraph test.

30. Defendant Imes and his CMHA colleagues had no reason to suspect Mr. Ayers of having murdered Ms. Brown. Mr. Ayers was innocent and had nothing to do with the crime. Moreover, as a gay man, Mr. Ayers did not fit the profile of the killer in the case, given the obvious sexual nature in which the victim had been attacked. Nevertheless, Defendants Donaldson, Imes, Morgan, Jakub, and as-yet Unknown CMHA employees became resolved to prove that Mr. Ayers committed the crime.

31. Four weeks later, impatient with the pace of the CPD investigation, Defendants Imes, Morgan, and as-yet unidentified CMHA police officers administered a "voice stress test" to Mr. Ayers. Mr. Ayers voluntarily took the test, as he had nothing to hide. Mr. Ayers vigorously disavowed any involvement in the crime.

32. Defendants Imes, Morgan, and as-yet Unknown CMHA employees falsely claimed that Mr. Ayers had failed the test. They told him that he had exhibited deception during the test. Mr. Ayers insisted that he had told the truth.

6

33. Defendants Imes and Morgan's representations were false. In fact, the test results indicated that Mr. Ayers was being truthful when he denied having murdered Ms. Brown.

34. Defendant Imes contacted Defendants Cipo and Kovach and informed them that he had administered a voice stress test to Mr. Ayers. Defendant Imes told them that the test results showed that Mr. Ayers exhibited deception during the test, but that he was unable to determine exactly what Mr. Ayers was being deceitful about.

35. Defendants Cipo and Kovach knew that voice stress tests were unreliable and could not support probable cause. In fact, voice stress tests were widely considered junk science. Nevertheless, Defendants Cipo and Kovach arranged to have Mr. Ayers come to their office for an interview.

36. Defendants Cipo and Kovach's investigation had gone cold. When Defendant Imes called to report Mr. Ayers's alleged deception, Defendants Cipo and Kovach saw the possibility of closing their case.

37. On February 3, 2000, Defendants Imes and Morgan brought Mr. Ayers to the police station to meet with Defendants Cipo and Kovach. Mr. Ayers went voluntarily, hoping to put the matter to rest.

38. Defendants Cipo and Kovach assailed Mr. Ayers with accusatory questions. They asked him why he had failed the stress test, even though they knew he had not. They accused him of fabricating the story about Ms. Brown calling him to seek assistance after she had fallen, even though Ms. Harris had spoken with them and other CPD officers on several occasions and corroborated Mr. Ayers's account.

39. Mr. Ayers insisted that he was innocent and that he was telling the truth.

7

40. Defendants Cipo and Kovach ultimately let Mr. Ayers go. For the next five weeks, however, they conspired with Defendants Donaldson, Imes, Morgan, Jakub, and as-yet Unknown CPD and CMHA employees to build a fabricated case against Mr. Ayers.

41. Specifically, Defendant Donaldson falsely reported that the LaRonde Apartments' video surveillance footage did not show Mr. Ayers going to the lockbox to obtain a key to Ms. Brown's apartment at 2 a.m. In fact, the video footage showed Mr. Ayers obtaining the key and then returning it shortly thereafter, just as he consistently maintained.

42. Defendants Cipo and Kovach corroborated Sergeant Donaldson's lie in a police report by stating that they, too, watched the tapes and failed to see Mr. Ayers, and that this evidence was further proof of Mr. Ayers's culpability. This was untrue, and Defendants Cipo and Kovach knew it.

43. Defendants Imes and others convened a CMHA Police Board hearing to make a finding that Mr. Ayers had lied during the investigation into Ms. Brown's death, even though they knew this was not true.

44. Defendants Cipo and Kovach coerced one or more witnesses to falsely implicate Mr. Ayers as the perpetrator of the violent crime. Defendants Cipo and Kovach did not document this coercion anywhere in their police reports and they did not record that the witnesses had ever taken positions contrary to those coerced and fabricated statements.

45. On March 14, 2000, Defendant Jakub brought Mr. Ayers back to the police station. In an interrogation room, Defendants Cipo and Kovach confronted him with the false and fabricated evidence and pressured him to confess to the crime. Mr. Ayers maintained his innocence.

46. March 14, 2000 would be Mr. Ayers's last day of freedom for more than eleven years. When Mr. Ayers would not confess, Defendants Cipo and Kovach ended the interrogation and arrested Mr. Ayers for the murder of Ms. Brown. Immediately thereafter they took him to the Cuyahoga County Jail.

47. Defendants Cipo and Kovach had no probable cause to arrest Mr. Ayers.

48. On March 16, 2000, Defendants Cipo and Kovach again interrogated Mr. Ayers, and again Mr. Ayers maintained his innocence.

49. On March 17, 2000, Defendants Cipo and Kovach brought Mr. Ayers to the police station for a third and final interrogation. Mr. Ayers maintained his innocence.

50. Defendants Cipo and Kovach obtained a search warrant for Mr. Ayers's residence. Nothing there tied Mr. Ayers to the crime.

51. On the sole basis of the Defendants' false and fabricated circumstantial evidence, a grand jury indicted Mr. Ayers for the murder of Ms. Brown on March 27, 2000.

## The Malicious Prosecution

52. With the trial date fast approaching, the Cuyahoga County Prosecutor's Office attempted to engage Mr. Ayers in plea negotiations. The prosecutors offered Mr. Ayers ten to fifteen years in prison. Mr. Ayers rejected their offer. They made a second offer, of three to ten years, which Mr. Ayers also rejected.

53. They then offered Mr. Ayers the opportunity to plead to a misdemeanor for Ms. Brown's murder. Mr. Ayers's attorneys encouraged him to take the deal, but Mr. Ayers refused. He was innocent, and would not plead otherwise.

54. Defendants knew the prosecutors would need more evidence to convict Mr. Ayers. So they set about to fabricate more evidence.

55. Specifically, the week before the trial began, Defendants Cipo and Kovach announced for the first time that Mr. Ayers had supposedly made inculpatory statements when they arrested him on March 14, 2000.

56. Defendants Cipo and Kovach fabricated those statements. Mr. Ayers had not made any inculpatory statements to Defendants Cipo and Kovach on March 14, 2000, or at any other time, because he was innocent and did not commit the crime.

57. Additionally, on the eve of trial, Defendants Cipo and Kovach enlisted the assistance of a jailhouse snitch. Defendants improperly fed details of the crime to a man named Donald Hutchinson, so that he could then falsely claim that Mr. Ayers had confessed to him while they were housed together at Cuyahoga County Jail. This was false, and Defendants knew it. In exchange for his perjured testimony, the prosecutors dropped all pending criminal charges against Mr. Hutchinson and released him from jail.

58. The jury trial began on November 27, 2000 and lasted until December 6, 2000.

59. No physical evidence tied Mr. Ayers to the crime. To the contrary, hair comparison analyses of the pubic hairs found in the victim's mouth excluded him as a suspect.

60. The jury engaged in lengthy deliberations, and at one point appeared deadlocked. The judge instructed them to continue deliberating.

61. Ultimately, on the basis of Defendants' fabrications, the jury came back with a guilty verdict. The judge sentenced Mr. Ayers to life in prison.

**The Exoneration**

62. Mr. Ayers never stopped fighting to prove his innocence.

63. After eleven years of fighting, Mr. Ayers succeeded. In a sharply worded opinion, the Sixth Circuit Court of Appeals vacated Mr. Ayers's conviction on October 5, 2010 and ordered the prosecutor's office to re-try him or release him within 180 days.

64. Among other things, the Court indicted Defendants Cipo and Kovach's conduct, finding that Mr. Hutchinson's testimony "strongly suggest[ed], at a minimum, that the police shared information with Hutchinson."

65. After the Sixth Circuit vacated Mr. Ayers's conviction, the Cuyahoga County Prosecutor's Office received results from DNA tests conducted on the pubic hairs found in the victim's mouth that conclusively excluded Mr. Ayers as the perpetrator.

66. The Cuyahoga County Prosecutor's Office determined it would not re-try Mr. Ayers. On September 12, 2011 – nearly twelve years after he was falsely arrested for a crime he did not commit – Mr. Ayers walked out of prison a free man.

### Mr. Ayers's Damages

67. Mr. Ayers cannot recover the twelve years he lost while he sat in prison, an innocent man. Although he is making every effort to integrate back into society and put his life back on track, he does so having lost more than a decade of life experiences.

68. The emotional pain and suffering Mr. Ayers experienced during those twelve years was substantial. In prison, Mr. Ayers endured hostility and harassment from both inmates and correctional officers because of his sexual orientation. He witnessed violence on a regular basis, and was the target of some of those attacks.

69. Additionally, while in prison Mr. Ayers lost his mother. Mr. Ayers had been incredibly close with his mother, and the pain of losing her – and not being able to say goodbye, or to have her witness his ultimate exoneration – was tremendous.

11

70.     Mr. Ayers missed out on holidays, births, funerals, and other life events with loved ones; the opportunity to pursue relationships and to fall in love; the ability to continue pursuing his career; and the fundamental freedom to live his life as an autonomous human being.

71.     As a result of the foregoing, Mr. Ayers has suffered tremendous damage, including physical harm and mental suffering, all proximately caused by Defendants' misconduct.

### Count I - 42 U.S.C. § 1983
### Due Process

72.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

73.     As described more fully above, all of the Individual Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Ayers of his constitutional right to a fair trial.

74.     In the manner described more fully above, the Individual Defendants deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Mr. Ayers could not and would not have been pursued.

75.     The Individual Defendants' misconduct also directly resulted in the unjust criminal conviction of Mr. Ayers, thereby denying him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

76.     As a result of this violation of his constitutional right to a fair trial, Mr. Ayers suffered injuries including but not limited to emotional distress, as is more fully alleged above.

77. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Ayers's constitutional rights.

78. The misconduct described in this Count was undertaken pursuant to a routine practice of the Cleveland Police Department to pursue wrongful convictions through profoundly flawed investigations and coerced evidence. In this way, Defendant City of Cleveland violated Mr. Ayers's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

79. These widespread practices, so well-settled as to constitute *de facto* policy in the Cleveland Police Department, were able to exist and thrive because municipal policymakers with authority over the Department exhibited deliberate indifference to the problem, thereby effectively ratifying it.

80. The widespread practices described in the preceding paragraphs were allowed to flourish because the City of Cleveland declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count II – 42 U.S.C. § 1983
## Malicious Prosecution

81. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

82. As described more fully above, all of the Individual Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Ayers of his constitutional right to be free from unlawful prosecution.

83. In the manner described more fully above, the Individual Defendants made, influenced and/or participated in the decision to prosecute Mr. Ayers for murder, for which

13

prosecution there was no probable cause and which caused Mr. Ayers to suffer a deprivation of liberty. Their misconduct included falsifying evidence and withholding exculpatory evidence.

84. As described more fully above, the prosecution was resolved in Mr. Ayers's favor.

85. The Individual Defendants' misconduct directly resulted in the unlawful prosecution and deprivation of Mr. Ayers's liberty in violation of his constitutional rights.

86. As a result of this violation of his constitutional rights, Mr. Ayers suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

87. The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Ayers's constitutional rights.

88. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Cleveland Police Department in the manner described more fully in preceding paragraphs 78-80, and was tacitly ratified by policymakers for Defendant City of Cleveland with final policymaking authority.

### Count III - 42 U.S.C. § 1983
### Failure to Intervene

89. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

90. In the manner described above, during the constitutional violations described above, one or more of the Individual Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

91. As a result of the Individual Defendants' failure to intervene to prevent the violation of Mr. Ayers's constitutional rights, Mr. Ayers suffered pain and injury, as well as emotional distress.

92. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Ayers's rights.

93. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Cleveland Police Department in the manner described more fully in preceding Paragraphs 78-80, and was tacitly ratified by policymakers for Defendant City of Cleveland with final policymaking authority.

## Count IV
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

94. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

95. After Ms. Brown was murdered, the Individual Defendants reached an agreement amongst themselves to frame Mr. Ayers for the crime, and to thereby deprive Mr. Ayers of his constitutional rights, all as described in the various Paragraphs of this Complaint.

96. In this manner, the Individual Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

97. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

98. As a direct and proximate result of the illicit prior agreement referenced above, Mr. Ayers's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

99. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

100. The misconduct described in this Count was undertaken pursuant to the policy and practice of the Cleveland Police Department in the manner described more fully in preceding Paragraphs 78-80, and was tacitly ratified by policymakers for Defendant City of Cleveland with final policymaking authority.

## Count V – State Law Claim
## Intentional Misrepresentation

101. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

102. As described more fully above, the Individual Defendants made representations to the prosecution that there was physical and testimonial evidence proving that Mr. Ayers's statements were false and that Mr. Ayers killed Dorothy Brown.

103. The Individual Defendants' statements were not true, but the prosecution relied on them nevertheless to prosecute and convict Mr. Ayers of murder.

104. The Individual Defendants knew that their statements were untrue and/or they were reckless in making those representations.

105. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Individual Defendants within the scope of their employment.

106. In addition, in making those representations, the Individual Defendants intended to deceive the prosecution.

107. As a proximate result of these misrepresentations, Mr. Ayers suffered injuries, including but not limited to emotional distress as is more fully alleged above.

16

### Count VI – State Law Claim
### Malicious Prosecution

108. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

109. Through their actions as described above, the Individual Defendants caused Mr. Ayers to be improperly subjected to a prosecution for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Mr. Ayers's favor.

110. The Individual Defendants accused Mr. Ayers of criminal activities knowing those accusations to be without genuine probable cause; fabricated evidence and withheld the manner in which that evidence was fabricated; and made statements and reports to the police and/or prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

111. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Individual Defendants within the scope of their employment and/or official responsibilities.

112. As a result of this misconduct, Mr. Ayers suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count VII – State Law Claim
### Negligent Supervision and Retention

113. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

114. Defendants City of Cleveland and CMHA negligently supervised and retained police officers within the Cleveland Police Department and the Cuyahoga Metropolitan Housing

17

Authority Police Department, resulting in Mr. Ayers being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

115. As a result of this misconduct, Mr. Ayers suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

### Count VIII – State Law Claim
### Intentional Infliction of Emotional Distress

116. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

117. As described more fully in the preceding paragraphs, by framing Mr. Ayers for a murder he did not commit, the Individual Defendants intended to cause emotional distress, or knew or should have known that their actions would result in serious emotional distress.

118. In doing so, the Individual Defendants' conduct was extreme and outrageous, going beyond all possible bounds of decency such that it can be considered completely intolerable in a civilized society, and this conduct caused Mr. Ayers to suffer serious emotional distress of the nature no reasonable man could be expected to endure.

119. The misconduct described in this Count was undertaken with malice, bad faith, and in a wanton and reckless manner, and was undertaken by the Individual Defendants within the scope of their employment.

120. As a result of this misconduct, Mr. Ayers sustained injuries, including emotional pain and suffering, as is more fully alleged above.

### Count IX
### Respondeat Superior

121. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

122. In committing the acts alleged in the preceding paragraphs, the Individual Defendants were members and agents of either (i) the Cleveland Police Department or (ii) the Cuyahoga Metropolitan Housing Authority Police Department, acting at all relevant times within the scope of their employment.

123. Defendants City of Cleveland and CMHA are liable as principals for all torts committed by their agents.

### Count X – State Law Claim
### Indemnification

124. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

125. Ohio law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

126. The Individual Defendants are or were employees of the City of Cleveland or CMHA, and acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorneys' fees, along with punitive damages against each of the individual Defendants in their individual capacities, as well as any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

        Respectfully submitted:

        /s/ Rachel Steinback
        Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Russell Ainsworth
Rachel Steinback
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900