UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------
                                                  :
David Ayers,                                      :
                                                  :        CASE NO. 1:12-CV-753
                Plaintiff,                        :
                                                  :
                                                  :
vs.                                               :        OPINION & ORDER
                                                  :        [Resolving Docs. No. 19, 20, 28, 39, 40, 43,
City of Cleveland, et al.                         :               53, 54, and 55.]
                                                  :
                Defendants.                       :
                                                  :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

David Ayers spent twelve years in prison for a rape and murder that he says he did not commit. Recently, the Sixth Circuit Court of Appeals ruled that the City of Cleveland's detectives violated Plaintiff Ayers's Sixth Amendment rights by creating a situation likely to violate Ayers's right to counsel. That Court granted Ayers's petition for a writ of habeas corpus, setting Ayers free. Ohio chose to dismiss the case and decided not to try Ayers again.

Ayers now sues. He alleges violations of the federal Constitution and Ohio law. Specifically, Ayers says that Defendants fabricated a confession that never took place and was never described in the extensive notes that Defendants kept of their contacts with Ayers; coerced a key witness to perjure himself to say that Ayers described the victim's death before she had been found; lied in affidavits; intentionally withheld exculpatory evidence; and violated his right to counsel. Responding to Ayers's claims, the Defendants move to dismiss the suit, or in the alternative, for summary judgment. For the reasons that follow, the Court DENIES Defendants' motions to dismiss,[1] and DENIES IN PART and GRANTS IN PART Defendants' motions for summary

---

[1] Docs. 39, 40, and 43.

Case No. 1:12-CV-753
Gwin, J.

judgment.[2][3/]  Further, Defendants' prior motions to dismiss[4/] are DENIED AS MOOT.

## I.  BACKGROUND

### A.  *Factual Background*

The Sixth Circuit adopted an Ohio Court of Appeals' opinion that discussed the background

of Ayres's case.  This Court repeats that discussion:

> The victim in this case, Dorothy Brown, was seventy-six years old at the time that
> she was murdered.  The victim was a resident of the LaRonde apartment complex on
> Shaker Boulevard in Cleveland.  The LaRonde apartment complex is a facility which
> was owned and managed by the Cuyahoga Metropolitan Housing Authority (CMHA)
> and which primarily serves elderly and disabled residents.  The victim's body was
> discovered at approximately 2:45 p.m. on the afternoon of December 17, 1999 and
> showed signs of numerous serious injuries including a fractured skull, trauma to the
> brain, fractures of the face, a broken finger on each hand as well as multiple bruises
> and scrapes.  The coroner's assistant who testified at trial stated that there were a
> total of 24–27 different wounds enumerated in the autopsy report.  Several of these
> wounds were characterized as defensive wounds, most likely received by the victim
> while trying to fend off an attacker.
>
> [David Ayers] although not elderly or disabled, was also a resident of the LaRonde
> apartments.  The appellant was employed by CMHA as a special police officer
> (SPO), the function of which is to provide security at CMHA complexes.  As part of
> his compensation for serving as an SPO, the appellant was permitted to live at the
> LaRonde apartments for a reduced rent of approximately $50 per month.  This
> program was adopted by CMHA to provide additional security and law enforcement
> visibility at CMHA buildings.
>
> It is not disputed that the [Ayers] knew the victim fairly well as the result of
> providing security in the building and that he had been in her apartment on several
> occasions prior to December 17, 1999.  It is also not disputed that in the early
> morning hours of December 17, 1999, at approximately 2:00 a.m., [Ayers,]
> accompanied by another resident of the complex, went to the victim's apartment for
> the purpose of assisting her from off of the floor where she had fallen and had been
> unable to get up.  This other resident was Sarah Harris, who the next afternoon

---

[2/]Docs. 53, 54, and 55.

[3/]A more detailed listing of which claims survive summary judgment is listed in Part III, *infra*.

[4/]Doc. 19, 20, and 28.

Case No. 1:12-CV-753
Gwin, J.

discovered the victim's body when she went to check on the victim. At the time that
Harris discovered the victim's body, the door to the victim's apartment was closed but
not locked.

The Cleveland police were notified of the apparent homicide at 2:44 p.m. on
December 17, 1999 and responded to the scene at approximately 3:13 p.m. At the
time that law enforcement initially responded, [Ayers] was observed outside of the
victim's unit on the fifth floor of the complex (the appellant lived on the first floor)
with a group of other residents, as well as in the building lobby, in a highly agitated
state. One of the officers who testified at trial stated that the appellant was "bawling"
sporadically in the lobby of the building during the time period in which police
initially responded to the scene and that his hands were extremely shaky while
answering questions.[5]

Over the next few months, Cleveland Police Detectives Michael Cipo and Denise Kovach

investigated Brown's murder. They focused first on Darrin Ward, who had previously been

convicted of a sex offense. Detective Kovach found this important because victim Brown was

discovered without pants on.[6] The detectives deemed Ward a "primary suspect."[7] For the weeks

following the murder, Ward could not be found.[8]

During this same period, CMHA officers became suspicious of Ayers. Near January 26,

2000, Imes conducted a "voice stress test" on Ayers. This test seeks to measure psychophysiological

stress responses in a human voice  A voice stress test should be conducted in a non-confrontational

and in a relaxed manner and setting.[9]

Imes testified that before the test began he told Ayers, "you are the last person we know of

that saw her alive," and "we all make mistakes and do things that are completely out of character and

---

[5]*Ayers v. Hudson*, 623 F.3d 301, 304-05 (6th Cir. 2010) (quoting *State v. Ayers*, No. 79134, 2002 WL 31031675, at *1-2 (Ohio Ct. App. 2002) (Corrigan, P.J., lead opinion)).

[6]Doc. 65-15.

[7]*Id.*

[8]Doc. 65-16.

[9]Doc. 65-12, at 3.

-3-

Case No. 1:12-CV-753
Gwin, J.

we are at a loss to explain why it happened."[10]  Imes informed Cipo and Kovach that Ayers "exhibited deception during this test.  He was unable to determine exactly what he was being deceitful about, but he was deceptive during his answers."[11]

Detectives Cipo and Kovach also sought victim Brown's phone records from the evening she was murdered.  Those records seemed to show that no outgoing calls were made from Brown's telephone that evening.[12]  This conflicted with statements from five to six persons who stated that they received calls from Brown that evening.[13]  The Brown phone call records also conflicted with Ayers's statement that Brown had called him on the night of her murder to request assistance.  Faced with the inconsistency between the phone records and numerous unrelated witnesses, the detectives responded that the witnesses' memories were wrong due to "alcohol,"[14] and because "most of those people that lived in that building were either senile or they were winos, so we couldn't believe anything anyone told us.  All of them said they got a call from the victim, and we were sort of laughing about it, going, 'Boy, these people have really got an imagination.'"[15]

Ayers quickly became a primary suspect.  On February 3, 2000, Cipo and Kovach interrogated Ayers.  Kovach said that when confronted with the voice stress test results, Ayers "made excuses that he was nervous."  She further wrote in a supplemental police report that "all the way through the interview it was certain Ayers was lying either to cover himself or someone else.

---

[10]/*Id.* at 5-8.
[11]/Doc. 65-17.
[12]/Doc. 65-23.
[13]/Doc. 65-3.
[14]/Doc. 65-25;
[15]/Doc. 65-10, at 44.

-4-

Case No. 1:12-CV-753
Gwin, J.

Ayers was a very peculiar man."[16]

A few days later, Cipo and Kovach interviewed a friend of Ayers, Ken Smith.  Detective Kovach noted that Smith "appeared very gay like . . . [he] is also a hairdresser and dressed and sat like a gay male.  Note: David Ayres [sic] gives quite the impression of also being gay."[17]  Smith later wrote a statement stating that he received a call from Ayers at around noon, and again around 2:00 PM the afternoon after the murder.[18]  Smith wrote that Ayers told him that a resident had died.  Detectives Cipo and Kovach seized upon this, noting that "the suspect called Smith at 1354 hours and told him about the victim's death[, but] the victim was not found until 1445 hours by Sarah Harris."[19]

On February 25, 2000, Kovach wrote that she had received a call from CMHA Defendant Donaldson, "who stated they viewed the tape of the lobby the morning of victim's death and the time span in which David Ayres [sic] said he went downstairs to get keys to lock victim's room after helping her up from the floor.  We were informed never on this tape did Ayres [sic] appear.  Obviously, Ayres [sic] was lying again."[20]  In fact, Ayers did appear on the videotape.[21]

On March 14, 2000, Detectives Cipo and Kovach again interrogated Ayers.  Both detectives testified that during this interview, Ayers said something to the effect of, "if I say I hit her, can I go home?"[22]  The entirety of Detective Kovach's notes pertaining to the interview are "we interviewed

---

[16]/Doc. 65-21.

[17]/Doc. 65-25.

[18]/Doc. 65-35.

[19]/Doc. 65-34.

[20]/Doc. 65-28.

[21]/Doc. 65-40.

[22]/Doc. 65-10, at 20.

Case No. 1:12-CV-753
Gwin, J.

Ayres [sic] and upon completion, he was booked for this homicide and conveyed to City Jail."[23]
During an interrogation two days later, Detective Kovach took extensive notes of their conversation
with Ayers.  Again, there was no mention of the statement.[24]

On March 17, 2000, Detective Cipo signed an affidavit in search of a search warrant for
Ayers's home.  In the affidavit Cipo stated that other CMHA tenants complained that "Ayers spent
an inordinate amount of time at the victim's apartment," that he had viewed the security tape and that
"Ayers does not appear at the time stated or thereafter," and that phone records between Ken Smith
and Ayers show that the calls were made prior to the discovery of the body."[25]                    W h i l e
awaiting trial, Ayers became acquainted with another inmate named Donald Hutchinson.[26]  The
parties dispute how many times Ayers and Hutchinson spoke, but they agree that Hutchinson spoke
with Detectives Cipo and Kovach at some point.  On November 25, 2000, "Hutchinson met with the
two detectives assigned to investigate Brown's murder [and] conveyed . . . Ayers's purported
confession."[27]  Hutchinson also told the detectives that he would be willing to testify at Ayers's trial.
The detectives informed Hutchinson that "the prosecutor would likely contact him and sent him back
to his jail pod that he shared with Ayers and other inmates."[28]

The police report of their meeting specifically referenced Hutchinson's failure to include
details about the murder weapon and any money taken from Brown's apartment.[29]  Hutchinson,

---

[23]/Doc. 65-32.  CMHA Officer Christopher Jakub also apparently wrote up a report of that evening's
interrogation [see doc. 65-33], though that report was not included in the record.  It is referenced in his deposition.
[24]/Doc. 65-34.
[25]/Doc. 65-31.
[26]/Ayers, 623 F.3d at 305.
[27]/Id.
[28]/Id.
[29]/Id. at 305-06.

Case No. 1:12-CV-753
Gwin, J.

however, apparently re-questioned Ayers,[30] at which point Ayers allegedly confessed to using a small, black iron to kill Brown and to stealing $700 from her.[31]  "The next day, Hutchinson telephoned his wife and asked her to contact the police on his behalf."[32]  He was then placed in protective custody.

"After discovery delays, caused in significant part by the State's untimely disclosure of evidence, a jury was sworn on November 22, 2000.  The following Monday, November 27, the State disclosed for the first time that it intended to call Hutchinson . . . ."[33]  The trial overruled Ayers's motion to suppress Hutchinson's testimony.[34]

According to the Sixth Circuit, the jury convicted Ayers of Brown's murder "based largely on Hutchinson's testimony and Smith's written statement . . . ."[35]  During his testimony, Smith sought to recant his statement, saying that Detectives Cipo and Kovach "pressured him into stating that Ayers phoned him regarding Brown's death prior to the discovery of her body."[36]  A panel of the Ohio Court of Appeals issued a divided opinion affirming Ayers's conviction but remanded for re-sentencing.[37]  On remand, Ayers was again sentenced to life in prison.[38]  The Ohio Supreme Court denied him leave to appeal.

---

[30]/In his deposition testimony, Ayers states he only spoke with Hutchinson once.  Doc. 56-3, at 8-10.

[31]/*Ayers*, 623 F.3d at 306.

[32]/*Id.*

[33]/*Id.* at 305.

[34]/*Id.* at 306.

[35]/*Id.* (noting that the jury was initially deadlocked).

[36]/*Id.*

[37]/*Id.*

[38]/*Id.*

Case No. 1:12-CV-753
Gwin, J.

*B.  Ayers's Petition for Habeas Corpus*

In January 2004, Ayers filed his § 2254 petition for a writ of habeas corpus.  The district

court denied the petition.  After granting a certificate of appealability, the Sixth Circuit reversed after

finding that police violated Ayers's Sixth Amendment right to counsel.   Centrally, the Sixth Circuit

found that police used a jailhouse informant to interrogate Ayers outside the presence of Ayers's

attorney.

The gist of the Sixth Circuit's reasoning is as follows:

The parties do not dispute that, at the time of the statements at issue, Ayers' Sixth
Amendment right to counsel had attached.  Moreover, contrary to the state appellate
court's lead opinion's factual determination, [informant] Hutchinson clearly testified
that he deliberately elicited information from Ayers after meeting with Detectives
Cipo and Kovach.  In fact, the State acknowledges in its appellate brief that . . .
Hutchinson did ask Ayers about the details of the murder."  Thus, the sole question
presented in this appeal is whether the State intentionally created a situation likely
to induce Ayers to make incriminating statements without the assistance of counsel,
when it returned Hutchinson to Ayers' jail pod and he thereafter deliberately elicited
information from Ayers regarding the murder weapon and the amount of money
taken from the victim. We hold that it did and that the state court's conclusion to the
contrary was not only wrong, but involved an unreasonable application of clearly
established federal law.[39/]

On October 5, 2010, the Sixth Circuit conditionally granted the writ of habeas corpus petition

with instructions that Ohio provides Ayers with a new trial within 180 days or release Ayers.[40/]  Ohio

chose to drop the case.  Ayers was released from prison on September 12, 2011.[41/]

*C.  The Instant Case*

On March 27, 2012, Ayers filed a complaint in this Court.[42/]  With his complaint, Ayers

---

[39/]*Id.* at 310.

[40/]*Id.*

[41/]Doc. 38, at 11.

[42/]Doc. 1.

-8-

Case No. 1:12-CV-753
Gwin, J.

alleges federal and state law claims against Detectives Michael Cipo and Denise Kovach and the City

of Cleveland (together, "the Cleveland Defendants") as well as against CMHA officers Patrick

Donaldson, Raymond Morgan, Thomas Imes, and Chris Jakub and CMHA ("together, "the CMHA

Defendants").[43/]  On July 20, 2012, Ayers filed an amended complaint.[44/]  With his complaints and

consistent with the Sixth Circuit opinion, Ayers generally alleges that the Defendants violated his

Sixth Amendment right to counsel by using informant Hutchinson to interrogate Ayers.  But Ayers

goes beyond this to say that Defendants fabricated evidence and perjured themselves to convict

Ayers.

Defendants have filed these dispositive motions, which are now ripe for decision .

## II.  LAW & ANALYSIS

Three sets of defendants have each filed motions to dismiss and for summary judgment.  To

the extent that an argument raised in a motion to dismiss is raised in a motion for summary

judgment, this Court will consider the argument in its summary judgment posture.  Arguments that

are raised only in a motion to dismiss are considered separately.

Title 42, section 1983 gives this Court jurisdiction over actions seeking damages resulting

from constitutional deprivations under the color of law.[45/]  While Section 1983 allows an action for

a constitutional violation, certain state officials are qualifiedly immune from liability under § 1983

so long as "their conduct does not violated clearly established statutory or constitutional rights of

which a reasonable person would have known."[46/]

---

[43/]*Id.*

[44/]Doc. 38.

[45/]42 U.S.C. § 1983.

[46/]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Case No. 1:12-CV-753
Gwin, J.

To determine whether a government official enjoys qualified immunity, this Court applies the two-pronged *Saucier* test and asks (1) whether the officer violated a constitutional right and (2) if so, whether that constitutional right was clearly established such that a "reasonable official would understand that what he is doing violates that right."[47]  To be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[48]  This Court may exercise its discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[49]

Once a defendant raises the defense of qualified immunity, Ayers must show that the defendant is not entitled to it.[50]  Ayers may do so by coming forward with evidence "sufficient to indicate that the [government official's] act in question violated clearly established law at the time the act was committed."[51]  The evidence must be "sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law."[52]  In considering the qualified immunity issue, all reasonable inferences are viewed in Ayers's favor.[53]

As guidance for where this opinion will go, this Court first considers whether Ayers alleges facts showing if there has been a constitutional violation.  If so, the Court then considers whether Ayers shows evidence sufficient to raise material issues that such constitutional violation occurred

---

[47]*Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

[48]*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[49]*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[50]*Simmonds*, 682 F.3d at 444.

[51]*Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir.1992).

[52]*Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994).

[53]*See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007).

-10-

Case No. 1:12-CV-753
Gwin, J.

to Ayers.  If both of these criterion are met, the Court will then determine whether that constitutional

right was clearly established.  Lastly, the Court will consider whether Ayers has produced sufficient

evidence in support of his *Monell* claims against the municipal defendants.

*A.  Count 1:  Violation of Due Process*

Ayers alleges that the individual defendants deprived him of his constitutional right to a fair

trial by not disclosing exculpatory evidence and by giving false reports, giving false testimony, and

by giving other false evidence.[54/]  Ayers originally made this claim against the Cleveland Defendants

and the individual CMHA Defendants, but now makes these claims against the Cleveland

Defendants.[55/]

Ayers points to three acts that are the basis for his due process claim.  First, he says that

Cleveland Defendant Detectives Cipo and Kovach coerced Ken Smith to give false testimony.  The

Defendants interviewed Smith, and Smith then signed a statement saying that Ayers called him and

spoke about Brown's murder before Brown's body had even been discovered.[56/]  Actually, police

had records showing that Smith called Ayers, and not that Ayers had called Smith.[57/]  During the

trial, Smith said the written statement was false and testified that Cipo and Kovach pressured him

to say that Ayers phoned him prior to the discovery of Brown's body.[58/]  Witness Smith now gives

an affidavit that states:

> the detectives showed me a statement they wanted me to sign.  I didn't want to sign
> it because I was not sure that it was the truth.  The detectives told me that the

---

[54/]Doc. 38, at 12.

[55/]Doc. 64, at 29.

[56/]Doc. 65-35.

[57/]*Ayers*, 623 F.3d at 306 (citation omitted).

[58/]Doc. 64, at 27.  *See also Ayers*, 623 F.3d at 306.

-11-

Case No. 1:12-CV-753
Gwin, J.

statement was what I said yesterday, and that if I changed what I said I could be charged with a crime, I think it was perjury. . . . I was afraid to say anything else because they had threatened to charge me with a crime.[59]

Ken Smith thus says that Detectives Cipo and Kovach pressured him to falsely say that Ayers knew about victim Brown's death before her body was discovered.

Next, Ayers says that Defendants Cipo and Kovach concealed T. Johnnie Williams's statements about Lawrence Reid, which could have been exculpatory. Williams, a neighbor of Brown's, testified at the trial that he had seen Brown the day she was murdered. In a deposition in this case, he says that Brown told him that her nephew, Lawrence Reid, had been stealing money from her.[60] Williams conveyed this information to Defendants Cipo and Kovach, but that information was not included in any police report and was not given to Ayers's defense.

Finally, Ayers says that Defendants Cipo and Kovach fed details regarding the murder to Donald Hutchinson. As already explained, the Sixth Circuit has noted that the underlying facts of this case "strongly suggest[], at a minimum, that the police shared information with Hutchinson."[61] By giving information to Hutchinson, Plaintiff Ayers says police enabled Hutchinson to later say that Ayers had confessed the specific details of Brown's murder to Hutchinson. Ayers says police joined this facilitating with benefits to Hutchinson that motivated Hutchinson to falsely testify that Ayers had confessed. Combined with the above allegations, Ayers says that Defendants Cipo and Kovach so bungled their investigation as to deprive Ayers of his fundamental right to receive a fair trial.

In response, Defendants Cipo and Kovach state that Ayers "has failed to demonstrate that

---

[59]/Doc. 65-26, at 1-2.

[60]/Doc. 65-9, at 6.

[61]/*Ayers*, 623 F.3d at 314.

-12-

Case No. 1:12-CV-753
Gwin, J.

[they] coerced any false testimony from Mr. Smith."[62/]  They also say that witness Williams's information that Brown's nephew had been stealing money from the victim was not material, and even if it was, that the nephew had passed a polygraph regarding the Brown murder.[63/]  Finally, Defendants challenge whether they gave details of the murder to Hutchinson and whether any information they gave Hutchinson allowed Hutchinson to falsely create a confession from Ayers.

Because the Sixth Circuit has already ruled on Ayers's habeas corpus petition, we have some of its reasoning.  At least regarding the background law, the Sixth Circuit's reasoning controls this Court.[64/]

Although his argument is somewhat unclear, Ayers seems to make a *Brady* claim.  That is, that Detectives Cipo and Kovach withheld evidence that was material and potentially exculpatory.  In *Brady v. Maryland*,[65/] the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In a later case, the Court explained, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[66/]  This responsibility to disclose material evidence extends to the police in the sense that to comply with *Brady*, a prosecutor has an obligation to "learn of any

---

[62/]Doc. 67, at 9.

[63/]*Id.*

[64/]6th Cir. R. 32.1(b).

[65/]373 U.S. 83, 87 (1963).  *See also United States v. Agurs*, 427 U.S. 97 (1976).

[66/]*United States v. Bagley*, 473 U.S. 667, 682 (1985).

-13-

Case No. 1:12-CV-753
Gwin, J.

favorable evidence known to the others acting on the government's behalf in this case, including the police."[67]  Police officers who withhold material exculpatory evidence from the prosecution, thereby preventing the evidence from being turned over to the defense, can be held personally liable under § 1983 for the *Brady* violation.[68]  No showing of bad faith is required.[69]

The Court finds that Ayers has alleged sufficient facts to show that Defendants Cipo and Kovach failed to disclose material evidence that could have resulted in a different verdict.  Williams told Cipo and Kovach that victim Brown had complained that her nephew, Lawrence Reid, had been stealing money from her.  Witness Smith would testify that Defendants Cipo and Kovach pressured him to falsely testify that Ayers made statements about Brown's death before her body was found.  Assuming the truth of Williams's and Smith's statements, as this Court must, *Brady* required disclosure of the circumstances of Smith's statement and required disclosure of Williams's statement.

Williams's testimony and Smith's sworn statement raise genuine issues of a *Brady* violation since that evidence was not disclosed to Ayers.

Finally, this Court has previously held that *Brady*'s application against police officers who fail to disclose material and potentially exculpatory evidence is clearly established law.[70]  Defendants do not contend otherwise.  Therefore, Defendants Cipo and Kovach do not enjoy qualified immunity as to Plaintiff Ayers's due process *Brady* claim, and the claim survives summary

---

[67] *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

[68] *See, e.g., Elkins v. Summit Cnty.*, 2009 WL 1150114 (N.D. Ohio Apr. 28, 2009) (collecting cases).

[69] *Id.*

[70] *See Elkins*, 2009 WL 1150114, at *3.  *See also Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009) ("Decisions from other circuits recognizing the type of '*Brady*-derived' claims that Moldowan asserts here date back as far as 1964.").

Case No. 1:12-CV-753
Gwin, J.

judgment.

### B. Count 2: Malicious prosecution

Ayers says that the individual defendants—the Cleveland Police Department detectives and the CMHA officers—"made, influenced, and/or participated in the decision to prosecute [him] for murder, for which prosecution there was no probable cause and which caused [him] to suffer a deprivation of liberty."[71] The officers' misconduct allegedly included "falsifying evidence and withholding exculpatory evidence."[72] Ayers also alleges that the officers' actions was undertaken pursuant to the policy and practice of the Cleveland Police Department.[73]

A § 1983 claim for malicious prosecution is cognizable, although "the contours of such a claim remain uncertain."[74] To succeed on such a claim, Ayers must prove the following: first, that a criminal prosecution was initiated against him and that the defendants made, influenced, or participated in the decision to prosecute; second, that there was a lack of probable cause for the criminal prosecution; third, that as a consequence of the proceeding, Ayers suffered a deprivation of liberty; and fourth, that the criminal proceeding was resolved in Ayers's favor.[75] Neither a lack of malice, nor the intervention of a prosecutor, works to absolve an individual officer of liability.[76]

### 1. Participation

The initial question is whether the individual CPD and CMHA officers are accountable for

---

[71]/Doc. 38, at 14.

[72]/*Id.*

[73]/*Id.*

[74]/*Stricker v. Twp. of Cambridge*, 2013 WL 141695, at *12 (6th Cir. Jan. 14, 2013) (published) (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)).

[75]/*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).

[76]/*Id.* at 309.

Case No. 1:12-CV-753
Gwin, J.

the prosecution.  When there has been a grand jury has made a probable cause finding, this Court

considers whether the officer "(1) stated a deliberate falsehood or showed reckless disregard for the

truth," and "(2) that the allegedly false or omitted information was material to the finding of probable

cause."[77]  Ayers says that Defendant Cipo swore to an affidavit containing false testimony.  In his

affidavit, Cipo testified that he had "reviewed the [security] video tape and Ayers does not appear

at the time stated or thereafter [returning Brown's key to the lockbox];" and that "phone records

subpoenaed show the call [between Ayers and Smith] was made" prior to the discovery of Brown's

body.[78]  In contrast to Cipo's affidavit, Cipo had never seen the videotape before signing the

affidavit and the videotape actually shows that Ayers returned Brown's key to the lockbox after

going to her room with Sarah Harris.[79]  This, along with the previously discussed coercion of Ken

Smith, satisfies Ayers's burden to show that Defendants Cipo and Kovach[80] acted in reckless

disregard of the truth when providing information material to the finding of probable cause.  Police

knew Ayers had gotten a key to Brown's apartment when he and Sarah Harris went to her apartment.

Cipo's statement that video tapes did not show Ayers returning the key after leaving Brown's

apartment was necessarily important to finding probable cause.  Similarly,  Cipo's testimony that

Ayers had called Smith before Brown's death was discovered was important, especially given

Smith's arguably perjured testimony that Ayers described Brown's death before it was known.

Ayers's alleged confession also raises questions.  In her deposition, Detective Kovach

testified that on March 14, 2000, Ayers said something to the effect of, "if I say I hit her, can I go

---

[77]/*Id.* at 312 (quotation marks, citation, and alterations omitted).

[78]/Doc. 65-31.

[79]/Doc. 65-6, at 103.

[80]/Although Detective Kovach did not sign the affidavit, she was a party to the interrogation of Ken Smith.  *See* doc. 65-35 (including Detective Kovach as a witness to Smith's statement).

-16-

Case No. 1:12-CV-753
Gwin, J.

home?"[81] Inexplicably, neither Detective Cipo nor Kovach made mention of Ayer's incriminating question in their contemporaneous report. Then neither Cipo or Kovach mentioned anything about the confession to a prosecutor until shortly before Ayers's trial was set to begin. Then, two days after the confession, Defendants Cipo and Kovach again interviewed Ayers yet their notes and reports show no mention of the previous confession, and the interrogation notes suggest that Ayers maintained his innocence.[82] And perhaps most concerning: Defendant Cipo did not mention the confession in his March 17, 2000, affidavit for a search warrant. The inference that the confession was concocted grows even stronger after considering what *did* make its way into the police reports. Defendants consistently made notes about Ayers's sexual orientation, his friends' sexual orientations, and whether people they questioned appeared "gay like."[83] They noted that certain witnesses "sat like a gay male."[84] Whatever the police officers meant to imply by sitting "like a gay male," it surely is less material than an extremely inculpatory statement that Cipo and Kovach say was made by the investigation's primary suspect during an early interrogation.

Ayers also includes CMHA officers Imes, Morgan, Donaldson, and Jakub in his malicious prosecution claim. In their motion for summary judgment, the CMHA individual defendants say that they cannot be held liable because they did not participate in the decision to prosecute. This is incorrect. An officer may be held liable if there is a reasonably foreseeable causal chain connecting

---

[81]/Doc. 65-10, at 20.

[82]/Doc. 65-34 ("On Thurs Mar. 16 we again brought the suspect, **AYERS**, to our office where he was interviewed. . . . He again said he isn't know [sic] why he flunked the voice stress test, other than being nervous . . . . Neither could he explain why the surveillance video did not show him getting the keys from the key box.).

[83]/Doc. 65-25, at 3.

[84]/*Id.*

Case No. 1:12-CV-753
Gwin, J.

his actions and the decision to prosecute.[85] Here, Ayers puts forth evidence that Officer Donaldson

lied to Detective Cipo about whether Ayers appeared on the surveillance video.[86] That information

found its way into Cipo's affidavit, which led to the decision to prosecute. Ayers also says that

Officer Imes improperly administered the voice stress test by acting in a confrontational manner.[87]

Be that as it may, Ayers goes too far in saying that Imes lied about the result of the test. That the

test's administration might have been flawed does not lead to a finding of deliberate falsehoods or

reckless disregard for the truth. Officer Imes, therefore, did not participate in the decision to

prosecute.

Ayers also cannot produce sufficient evidence to show that Officers Jakub and Morgan

engaged in such deception. Ayers lists "Defendant Jakub's falsification of a document alleging

Plaintiff had (whatever the motive) admitted guilt" as the basis for the claim.[88] But, nowhere in the

response to the motion for summary judgment does Ayers indicate what that document is or where

it appears in the record.[89] Similarly, Ayers states that Defendant Morgan "falsified information

regarding video surveillance footage." As already noted, the person responsible for conveying

improper information to Detective Cipo was Donaldson, nor Morgan. Therefore, Ayers has

produced sufficient evidence of participation against only CMHA Officer Donaldson.

---

[85]/*See Sykes*, 625 F.3d at 316 (concluding that for liability to accrue, "the consequences of the officer's actions must be reasonably foreseeable [and] that the officer's action must have influenced the continued detention").

[86]/Doc. 65-6, at 103 ("Q: You now know that the information that Sergeant Donaldson gave you is false, right? A: Correct.").

[87]/Doc. 64, at 13; *see* doc. 65-12, at 8 (Imes saying that he was confrontational during the voice stress test even though his training required him to be non-confrontational).

[88]/Doc. 64, at 27.

[89]/Plaintiff's counsel showed Ayers the Jakub report during Ayer's deposition in this case. *See* doc. 65-7, at 30. This Court, however, has not found the report in the submitted record. Rather, the only evidence directly relevant to Officer Jakub in the exhibits accompanying Ayer's omnibus response to Defendants' motions for summary judgment is Jakub's deposition transcript.

Case No. 1:12-CV-753
Gwin, J.

### 2. Probable Cause

Defendants point out the Sixth Circuit has held that "it has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer."[90]  Ayers does not respond to this argument, but instead cites to a case from this Court addressing a state-law malicious prosecution claim.[91]  Subsequent Sixth Circuit decisions have clarified that officers "cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute" the plaintiff.[92]

The prosecution included Cipo's testimony that "several complaints had been made by other tenants that Ayers had spent an inordinate amount of time at the victim's apartment," that Ayers had lied about returning Brown's key to the lockbox, the statement from Ken Smith that Ayers knew of Brown's death before her body had been discovered, the voice stress test analysis, and the alleged confession.  Of these, the video, Smith's statement, and the confession are already suspect.  Given the remaining items—that Ayers spent time with Brown and that he exhibited deception on an improperly administered voice stress test—there was insufficient cause to arrest and prosecute Ayers. Recall, Brown had been sexually molested.  Ayers was gay.  Recall, Brown was found with a foreign pubic hair in her mouth that did not match Ayers.

### 3. Deprivation of liberty

The parties do not dispute that Ayers suffered a deprivation of liberty due to the prosecution.

---

[90] *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006).

[91] Doc. 64, at 25 (citing *Elkins*, 2009 WL 1150114).

[92] *Sykes*, 625 F.3d at 317 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).

-19-

Case No. 1:12-CV-753
Gwin, J.

### 4. End of criminal proceedings

The final element of a § 1983 malicious prosecution claim that must be alleged and proven "is termination of the prior criminal proceeding in favor of the accused."[93]  The Cleveland Defendants note that the charges against Ayers were dismissed without prejudice following the Sixth Circuit's grant of Ayers's petition for a writ of habeas corpus.[94]  Neither the Defendants nor Ayers provides a citation to any federal case discussing whether Ayers's situation qualifies as an "end" to a criminal proceeding.

Section 1983 suits of this sort are, in some sense, considered collateral attacks on prior prosecutions and convictions.[95]  To require an end to the prior criminal proceedings "avoids parallel litigation over the issues of probable cause and guilt and it precludes the possibility of the claimant succeeding in the tort action after having been convicted in the underlying criminal prosecution . . . ."[96] But in *Heck*, where this requirement finds its origin, the Court specifically noted that a claimant may pursue a § 1983 claim when a conviction is "called into question by a federal court's issuance of a writ of habeas corpus."[97]  This Court finds that Ayers's habeas relief satisfies this element, especially where Ohio has not brought Ayers to trial within Ohio's Speedy Trial Act ends any chance of conviction.[98]

The Court therefore finds that, viewing the evidence in a light most favorable to Ayers, there

---

[93]*Heck v. Humphrey*, 512 U.S. 477, 484 (1994).

[94]Doc. 56, at 18.

[95]*Heck*, 512 U.S. at 484-487.

[96]*Id.* at 484 (quotation marks and alterations omitted).

[97]*Id.* at 487.

[98]Ohio Rev. Code § 2945.71 ("A person against whom a charge of felony is pending: (2) Shall be brought to trial within two hundred seventy days after the person's arrest."); *State v. Reeser*, 407 N.E.2d 25, 26 (Ohio 1980) ("In a series of cases, this court has imposed upon the prosecution and the trial courts the mandatory duty of complying with [Ohio's Speedy Trial Act].").

Case No. 1:12-CV-753
Gwin, J.

is sufficient evidence that Defendants Cipo, Kovach, and Donaldson violated Ayers's constitutional right to be free of malicious prosecution under the Fourth Amendment. Further, the Court finds that through deposition testimony and affidavits, Ayers has created a genuine issue of material fact. Finally, the Court finds that the acts in question—stating falsehoods in warrant affidavits and mischaracterizing key evidence—is  well-understood by reasonable officers to be violative of a suspect's rights.

### C.  Count 3: Interference with Sixth Amendment rights

Ayers says that Defendants Cipo and Kovach violated his Sixth Amendment rights by interfering with his right to counsel. Defendants say that Ayers's deposition testimony precludes this claim. Essentially, they argue that because Ayers testified that he spoke with informant Hutchinson only once, there was no way that Defendants Cipo and Kovach could have been feeding information to Hutchinson. Ayers responds by saying that the relevant question is not whether Cipo and Kovach fed information to Hutchinson, but whether Hutchinson met with Ayers' on the detectives' behalf.

"In order to state a § 1983 cognizable claim for deprivation of right to counsel, there must be some allegation indicating an interference with the [plaintiff's] relationship with counsel."[99]  The Sixth Circuit outlined the contours of the Sixth Amendment's right to counsel guarantee in Ayers's habeas case. The right "has been accorded, not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial."[100]  A criminal defendant has the right to have counsel present at all critical stages of the criminal proceeding, of which interrogation is one.[101]

---

[99]/*Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010).

[100]/*Ayers*, 623 F.3d at 308 (quoting *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)).

[101]/*Id.* (quotation omitted).

Case No. 1:12-CV-753
Gwin, J.

"The right to counsel applies not only to direct confrontations by known government officers, but also to 'indirect and surreptitious interrogations.'"[102] Most importantly for the instant purposes, "a Sixth Amendment violation occurs whenever the State 'intentionally creates a situation likely to induce a defendant to make incriminating statements without the assistance of counsel."[103]

The Sixth Circuit has already answered that question. "Thus, the sole question presented in this appeal is whether the State intentionally created a situation likely to induce Ayers to make incriminating statements without the assistance of counsel . . . . We hold that it did."[104] Even if Defendants Cipo and Kovach did not tell Hutchinson to solicit information, a constitutional violation can still occur.[105]

Even so, Defendants point to the chronology of events as outlined in the Sixth Circuit's opinion. The Sixth Circuit noted that a November 25, 2000, police report detailed informant Hutchinson's first statements to Cipo and Kovach. In that report, Cipo and Kovach documented that Ayers told Hutchinson that he had returned to Brown's apartment around 3:00 AM, but did not reveal what weapon was used to kill Brown or how much money he had taken.[106] In another report penned on November 27, 2000, the detectives wrote that they again interviewed Hutchinson, who now says that Ayers detailed the weapon used and the money stolen.[107] This, of course, conflicts with Ayers's testimony that he only spoke once with Hutchinson.[108]

---

[102]*Id.* (quoting *United States v. Henry*, 447 U.S. 264, 273 (1980)).

[103]*Id.* (quoting *Henry*, 447 U.S. at 274).

[104]*Id.* at 310.

[105]*Id.* ("We agree with those courts that do not limit agency in the *Massiah* context to cases where the State gave the informant instructions to obtain evidence from the defendant.").

[106]*Id.* at 312.

[107]Doc. 61-39.

[108]Doc. 56-3, at 8-10.

-22-

Case No. 1:12-CV-753
Gwin, J.

But at this stage of the proceedings, all inferences must be drawn in favor of Ayers. In her deposition, Detective Kovach recounts that after her initial meeting with Hutchinson, she returned him to the prison and said that they could not speak again.[109] But on November 27, 2000, only two days after the initial meeting, Hutchinson's wife paged Detective Kovach.[110] The Court obviously infers that Kovach or Cipo gave Hutchinson a pager number for the purposes of gathering more evidence. Even if Ayers only spoke to Hutchinson once, the pager information casts doubt on Kovach and Cipo's deposition statements. If true, this action "intentionally created a situation likely to induce Ayers to make incriminating statements without the assistance of counsel."[111]

Further, the right in question, articulated perhaps most forcefully by the Supreme Court in its 1980 *Henry* decision, is well-established. The Sixth Circuit relied upon this right in its decision granting habeas relief. But more importantly, both Defendants Cipo and Kovach testified that they knew that they were not supposed to place prison informants alongside suspects for the purposes of gathering information. Therefore, Ayers has produced evidence creating a genuine issue that a constitutional right has been violated, and that the right in question was clearly established at the time of the Defendants' actions.

### D. Count 4: Failure to intervene

Ayers alleges that Detectives Cipo and Kovach violated his constitutional rights when they stood by without intervening to prevent the misconduct, and that they did so pursuant to the policy

---

[109]/Doc. 65-10, at 62-63. Detective Cipo stated a similar concern in his deposition. *See* doc. 65-6, at 133.
[110]/Doc. 61-39.
[111]/*Ayers*, 623 F.3d at 310.

-23-

Case No. 1:12-CV-753
Gwin, J.

and practice of the Cleveland Police Department.[112] Cipo and Kovach say they are qualifiedly immune from this claim.

In conducting the qualified immunity analysis, sufficient evidence suggests that constitutional violations occurred. Certainly, the right to *Brady* material, to a constitutionally sufficient indictment, or to counsel during important criminal proceedings is clearly established. But with the failure to intervene claim, the Court must ask whether there was a clearly established constitutional right that a law enforcement officer was required to intervene to prevent another law enforcement officer from violating these rights. For there to be a failure to intervene, there must be a corresponding duty. There is ample Sixth Circuit caselaw regarding police officers' duty to intervene in excessive force cases.[113] But the Court finds no such caselaw (nor does Ayers provide any) regarding a duty to intervene in the situations described in Ayers's complaint.[114] "[G]iven the absence of any case law that has imposed a duty of protection under even roughly analogous circumstances,"[115] it could not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[116] Therefore, the Court concludes that the failure to intervene claim is independent of the other claims and that there is insufficient authority to show that Detectives Cipo and Kovach violated clearly established law.

---

[112]/Doc. 38, at 15. Ayers originally brought this claim against both the CPD and CMHA individual defendants. He waived it against the CMHA defendants in his response to Defendants' motions for summary judgment. Doc. 64, at 32.

[113]/*See e.g.*, *Smoak v. Hall*, 460 F.3d 768, 784-85 (6th Cir. 2006); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Durham v. Nu'Man*, 97 F.3d 862, 866-68 (6th Cir. 1996).

[114]/*Cf. Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir.1999) (finding no clearly established law that a police officer who knows another police officer fabricated a confession in a police report for a warrantless arrest has a constitutional duty to intervene).

[115]/*Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 507 (6th Cir. 2007).

[116]/*Saucier*, 533 U.S. at 207.

-24-

Case No. 1:12-CV-753
Gwin, J.

*E.  Count 5: Conspiracy*

Ayers alleges that the individual defendants conspired to deprive him of his constitutional

rights, and that they did so pursuant to a policy or practice of the City of Cleveland.[117]  In his

omnibus response to Defendants motions for summary judgment, he waives this claim against

CMHA Defendants Donaldson and Jakub.[118]

The standard for proving a civil conspiracy claim in the Sixth Circuit is as follows:

A civil conspiracy is an agreement between two or more persons to injure another by
unlawful action.  Express agreement among all the conspirators is not necessary to
find the existence of a civil conspiracy.  Each conspirator need not have known all
of the details of the illegal plan or all of the participants involved.  All that must be
shown is that there was a single plan, that the alleged coconspirator shared in the
general conspiratorial objective, and that an overt act was committed in furtherance
of the conspiracy that caused injury to the complainant.[119]

Ayers says that Defendants Cipo, Kovach, Imes, and Morgan "worked in concert to gather

false evidence, through fraudulent means, in order to implicate Plaintiff in the murder."[120]  The

Court  finds that Ayers does not identify sufficient record evidence to support an inference that

Detectives Imes and Morgan conspired to deprive Ayers of his constitutional rights.  Even assuming

that Imes administered the stress test improperly, his actions could just as easily have been the result

of individual, and not conspiratorial, conduct.  In the facts section of his summary judgment

response, Ayers notes only that Imes gave the test results to Cipo and Kovach, and that Cipo put

great weight on Imes's report.  But this, by itself, does not suggest concert.  Similarly, the record

does not support a finding that Defendant Morgan engaged in any conspiracy, as the police reports

---

[117]/Doc. 38, at 16.

[118]/Doc. 64, at 32 n.1.

[119]/*Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th
Cir. 1985)).

[120]/Doc. 64, at 32.

Case No. 1:12-CV-753
Gwin, J.

indicate only that he was present at certain interrogations.[121]

Evidence in the record does suggest, however, that Defendants Cipo and Kovach worked in concert to violate Ayers's constitutional rights. Both testified that they were present when Ayers supposedly confessed to the crime, yet neither memorialized that event or informed the prosecutor of it.[122] If, as Ayers alleges, the confession never occurred, then it is logical to infer from the peculiar circumstances that Cipo and Kovach acted in concert. And, according to Smith (and the Sixth Circuit's understanding of the facts), both Cipo and Kovach coerced Smith into making a false statement.[123]

Ayers has produced sufficient allegations and evidence that Detectives Cipo and Kovach conspired to violate his constitutional rights. While the underlying rights were clearly established, this Court must now determine whether the act of improperly conspiring was similarly established.[124]

Prior cases provide minimal guidance on how to treat these types of inchoate allegations in § 1983 claims. Regardless of whether the relevant question is if the underlying right was clearly established, or if the act of conspiring was clearly established, the outcome in the instant case is the same. A reasonable officer would know that commission of the alleged acts—withholding potentially exculpatory evidence, coercing perjury, false attestation, or inventing a confession—would violate constitutional rights. But the act of conspiring to do any of those things is *also* clearly established. A right is clearly established by more than just prior caselaw saying that

---

[121]/Doc. 65-16; doc. 65-21.

[122]/Doc. 65-6, at 129; doc. 65-10, at 13.

[123]/Doc. 65-26.

[124]/*See, e.g.*, *Windson v. The Tennessean*, 719 F.2d 155, 165 (6th Cir. 1983) ("Consequently, we hold that a reasonable person would not have known in 1980 that an agreement to defame a federal official in order to effect that person's discharge from federal employment violated section 1985(1).").

Case No. 1:12-CV-753
Gwin, J.

it is so.  It can also be clearly established if a reasonable official would understand that what she is doing violates a constitutional right.[125/]  To say that Defendants Cipo and Kovach could be held liable for acting alone, but not for creating a plan to accomplish the same ends, is unreasonable.  Plaintiff's conspiracy claim against Defendants Cipo and Kovach survives summary judgment, as there is sufficient evidence that the partner detectives worked in concert.

*F.  Ayers's State Law Claims Against Individual Defendants*

Ayers raises three state law claims against individual defendants.  He raises an intentional misrepresentation claim against Defendants Cipo and Kovach,[126/] a malicious prosecution claim against all individual defendants,[127/] and an intentional infliction of emotional distress claim against all individual defendants.[128/]

Each individual defendant raises an affirmative defense of statutory immunity under Ohio Revised Code § 2744.03(A)(6).  This section provides immunity to employees of Ohio political subdivisions except where (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon the employee by a section of the Revised Code.[129/]

*1.  Intentional misrepresentation*

Ayers alleges that Defendants Cipo and Kovach made representations to the prosecution that

---

[125/]*Hoover v. Radabaugh*, 307 F.3d 460, 468 (6th Cir. 2002).

[126/]Ayers waived this claim as to the CMHA individual defendants in his omnibus response to Defendants' motions for summary judgment.  The claim therefore is now only against Defendants Cipo and Kovach.

[127/]Doc. 38, at 18.

[128/]*Id.*

[129/]*Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 791 (6th Cir. 2012).

Case No. 1:12-CV-753
Gwin, J.

there was physical and testimonial evidence inculpating Ayers.[130/]  Under Ohio law, a claim for fraud

requires:

> (1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance.[131/]

Even assuming that Ayers can prove each requirement, this claim fails as a matter of law.  Under

Ohio law, "a claim in fraud cannot be predicated upon statements or representations made to a third

party; i.e., the communication must have been directly with the person who has brought the

action."[132/]  Ayers therefore lacks standing to raise this claim.

### 2. *Malicious prosecution*

Ayers alleges that the individual defendants caused him to be improperly subjected to a

prosecution for which there was no cause.[133/]  Malicious prosecution under Ohio law requires the

following: (1) malicious institution or continuance of an earlier proceeding; (2) lack of probable

cause for the earlier proceeding; and (3) termination of the prior lawsuit in favor of the claimant.

As already discussed in Part II.B, *supra*, this Court already determined that CMHA

defendants Imes, Morgan, and Jakub did not engage in the institution or continuance of the

proceedings.  Therefore, a statutory immunity analysis need only be conducted as to Defendants

---

[130/]Doc. 38, at 17.

[131/]*Volbers-Klarich v. Middletown Mgmt.*, 929 N.E.2d 434 (Ohio 2010).

[132/]*McWreath v. Cortland Bank*, 2012 WL 2522933, at *11 (Ohio Ct. App. June 29, 2012) (citing *Edwards v. Owen*, 15 Ohio 500 (1846)).  *See also* 51 Ohio Jr. 3d Fraud & Deceit § 118 (2012) ("To secure relief from fraudulent representations, a plaintiff must have been intended to act upon the fraudulent representations, whether they were made directly or indirectly.").

[133/]Doc. 38, at 17.

Case No. 1:12-CV-753
Gwin, J.

Cipo, Kovach, and Donaldson.

"Based upon the facts presented, a jury could reasonably conclude that [these defendants] acted in bad faith or in a wanton or reckless manner."[134/]  Defendants Cipo and Kovach are alleged to have coerced Ken Smith into perjuring himself to say that Ayers had described Brown's death before her death had been discovered, lest he risk prosecution.  They also are alleged to have withheld exculpatory evidence, and to have, at the very least, mischaracterized the contents of their interrogation sessions.  Defendant Cipo did not tell the truth in his affidavit supporting the search warrant.  At the very least, he falsely said that he had reviewed CMHA videotapes and that those videotapes did not show Ayers returning any key to Brown's apartment to the lockbox.  Finally, Defendant Donaldson told Defendant Cipo that Ayers did not appear on the security camera video, when Ayers in fact did.  Ayers alleges more than simply a negligent investigation—he alleges an investigation that was at best deeply flawed, and at worst, deceptive.

The first and third conditions of the cause of action—malicious institution and cessation of the prior lawsuit, respectively—have been met.[135/]  Under Ohio law, probable cause is defined as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious individual in the belief that the person accused is guilty of the offense with which he or she is charged."  Viewing the evidence in a light most favorable to Ayers, the only non-suspect evidence supporting a reasonable ground of suspicion included irregular results on the voice stress test and reports from neighbors that Ayers spent a lot of time in Dorothy Brown's apartment.  Viewing this evidence from the perspective of a "cautious individual," this Court cannot say that

---

[134/]*Campbell*, 700 F.3d at 791.

[135/]*See* Part II.B, *supra*.

Case No. 1:12-CV-753
Gwin, J.

probable cause existed to pursue Ayers's prosecution.  Therefore, Ayers has produced sufficient

evidence supporting his malicious prosecution claim under Ohio law against Defendants Cipo,

Kovach, and Donaldson.

### 3. *Intentional infliction of emotional distress (IIED)*

Ayers says that the individual defendants engaged in a course of conduct such that they

"intended to cause emotional distress, or know or should have known that their actions would result

in serious emotional distress."[136]  Under Ohio law, a plaintiff must present evidence creating a

genuine issue of material fact:

> (1) that the actor either intended to cause emotional distress or knew or should have
> known that actions taken would result in serious emotional distress to the plaintiff,
> (2) that the actor's conduct was so extreme and outrageous as to go beyond all
> possible bounds of decency and was such that it can be considered as utterly
> intolerable in a civilized community, (3) that the actor's actions were the proximate
> cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the
> plaintiff is serious and of a nature that no reasonable man could be expected to endure
> it.[137]

The emotional injury must be both severe and debilitating.[138]  The Ohio Supreme Court has clarified

that a successful IIED claim "is one in which the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to explain, 'Outrageous!'"[139]

Defendants Cipo and Kovach do not respond directly to this claim, but the CMHA individual

defendants do.  They say that under Ohio law, an IIED claim must be filed within four years of the

---

[136]Doc. 38, at 19.

[137]*Rosebrough v. Buckeye Valley High School*, 690 F.3d 427, 433 (6th Cir. 2012) (quoting *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio Ct. App. 1995)).

[138]*Banford v. Aldrich Chem. Co.*, 932 N.E.2d 313, 319 (Ohio 2010).

[139]*Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America, et al.*, 453 N.E.2d 666, 671 (Ohio 1983) (quotation omitted) (abrogated on other grounds by *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007)).

Case No. 1:12-CV-753
Gwin, J.

actions' accrual.[140]  Therefore, they argue, the action accrued when Ayers was incarcerated in 2001

and the claim must have been filed by 2005.[141]  In support, they cite to a decision from this district.[142]

That citation is misleading.

In *Lee*, Judge Wells analyzed Ohio's statute of limitation for IIED claims and found that

"when the acts underlying the claim would support another tort, the statute of limitations for that tort

governs the claim for" IIED.[143]  In that case, the IIED claim arose out of a false arrest, which accrued

at the time of arraignment.[144]  Here, the primary accompanying tort is arguably the malicious

prosecution tort.  As Judge Wells noted in *Lee*, the statute of limitations for malicious prosecution

requires that the action be commenced within one year after the termination of the prosecution in

favor of the accused.[145]  The claim is therefore timely.

In support of his IIED claim, Ayers puts forth the affidavit of Dr. Thomas Swales, a licensed

psychologist and an Assistant Professor of Psychiatry, Psychology, and Pediatrics at Case Western

Reserve University in Cleveland.[146]  According to Dr. Swales, Ayers suffers from "Posttraumatic

Stress Disorder and Major Depressive Order. . . . These injuries are a direct result of his wrongful

incarceration for nearly eleven years."[147]

This Court finds that Ayers has presented sufficient allegations of wrongdoing to support his

claim against Defendants Cipo, Kovach, and Donaldson.  According to Ayers, those defendants

---

[140]Doc. 54-1, at 23.

[141]*Id.*

[142]*Lee v. Lucas*, 2011 WL 5361509, at*4 (N.D. Ohio Oct. 31, 2011).

[143]*Id.*

[144]*Id.* at *5.

[145]*Id.* (citing Ohio Rev. Code § 2305.11(A)).

[146]Doc. 65-39.

[147]*Id.*

Case No. 1:12-CV-753
Gwin, J.

engaged in conduct intended to inculpate a man for which there was insufficient evidence of guilt. Arguably, these defendants misrepresented key facts, as well as potentially coerced witnesses to utter falsehoods under oath. The Court does not doubt that presentment of the facts, as alleged by Ayers, would be shocking and outrageous to average members of the community.

The CMHA Defendants dispute that their actions caused Ayers's emotional distress; rather, they argue, it was the conviction and incarceration that led to that distress.[148/] But the relevant analysis is whether the actions proximately caused the distress, which a jury could reasonably find based on the facts alleged here. The causal chain is not broken simply because a jury decided to convict.

The Court also finds that Defendants Cipo, Kovach, and Donaldson have not met their burden under Federal Rule of Civil Procedure 56 to show "that there is no genuine dispute as to any material fact . . . ."[149/] Rather, Ayers has presented testimonial and documentary evidence that creates a genuine dispute as to whether these defendants acted in a particularly reckless manner. As all inferences must be drawn in Ayers's favor when considering a motion for summary judgment, the Court finds that this claim should proceed to trial.

*G. Counts 8 & 10: Negligent supervision & respondeat superior, respectively*

Ayers says that Defendants City of Cleveland and CMHA negligently supervised and retained police officers, resulting in the previously discussed violations of his constitutional rights.[150/] He also says that the municipal defendants are liable as principals for all torts committed by their agents."

---

[148/]Doc. 54-1, at 17.
[149/]Fed. R. Civ. P. 56(a).
[150/]Doc. 38, at 18.

Case No. 1:12-CV-753
Gwin, J.

In his omnibus response to Defendants' motions for summary judgment, he says that he "does not object to the entry of summary judgment on Counts VIII and X as to Defendants City of Cleveland and CMHA." These claims are therefore waived and dismissed.

*H. Count 11: Indemnification*

Ayers says that "Ohio law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities."[151] He therefore brings an indemnification claim against the municipal defendants.

Defendants City of Cleveland and CMHA raise the following arguments: (1) an indemnification claim is misplaced, as only the employee may sue a sovereign employer for defense or indemnity;[152] and (2) that such a claim must fail because the individual defendants are not liable.[153] As the claims against some of the individual defendants are allowed to proceed, this second argument need not be considered.

Ohio Revised Code § 2744.07(A)(1) states that "a political subdivision shall provide for the defense of an employee, in any state or federal court, in any civil action or proceeding which contains an allegation for damages for injury, death or loss to person or property caused by an act or omission of the employee . . . ." The duty to defend accrues if "the act or omission occurred while the employee was acting both in good faith and not manifestly outside the scope of employment or official responsibilities."[154] The duty to indemnify accrues upon issuance of a judgment against the employee for compensatory damages caused by an act or omission in connection with a governmental

---

[151]*Id.* at 20.

[152]Doc. 43, at 12 (citing *Buckeye Union Insurance Company v. Arlington Bd. of Ed.*, 638 N.E.2d 170 (Ohio Ct. App. 1984)).

[153]Doc. 56, at 34.

[154]Ohio Rev. Code § 2744.07(A)(1).

Case No. 1:12-CV-753
Gwin, J.

function.[155/]  Should the political subdivision fail to uphold its duty, the statute outlines a mechanism

for Ohio courts to consider the employee's claims and to "order the political subdivision to defend

the employee in the action."[156/]

Therefore, the indemnification claim does not survive.

I. *Ayers's* Monell *claims against the municipal defendants*

To raise a claim against a municipality for a constitutional violation under § 1983, Ayers must

show that the municipality's policy or custom caused the alleged injury.[157/]  To show an unlawful

policy or custom, Ayers can show, among other things, a policy of inadequate training or

supervision.[158/]  To do so, Ayers must prove the following:  "(1) the training or supervision was

inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate

indifference; and (3) the inadequacy was closely related to or actually caused the injury."[159/]

Deliberate indifference must reflect a deliberate or conscious choice by the municipality.[160/]  A

municipality may be deliberately indifferent when "in light of the duties assigned to specific officers

or employees the need for more or different training is so obvious, and the inadequacy so likely to

result in the violation of constitutional rights. . . ."[161/]

In this case, Ayers presents no evidence of inadequate training or supervision attributable to

the City of Cleveland.  Ayers has presented evidence that the individual defendants' investigation

---

[155/]*Id.* § 2744.07(A)(2).

[156/]*Id.* § 2744.07(C).

[157/]*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-97 (1978).

[158/]*City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

[159/]*Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690 (6th Cir. 2006) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

[160/]*City of Canton v. Harris*, 489 U.S. 378 (1989).

[161/]*Id.* at 390.

Case No. 1:12-CV-753
Gwin, J.

was flawed, but there is no evidence that these alleged errors, even if committed, were a result of

inadequate training or supervision.  Further, even if the alleged investigative failures were the result

of inadequate training or supervision, Ayers has not shown that the inadequacy was the result of the

City of Cleveland's "deliberate indifference."  Ayers can only point to Defendant Kovach's "99%

confession rate,"[162] but this by itself is insufficient to lead a jury to find that inadequacy in training

or supervision was closely related to Ayers' other federal claims.  The Court therefore grants

summary judgment to the City of Cleveland as to Ayers's *Monell* claim.

### III.  CONCLUSION

For the foregoing reasons:

- Defendants' motions to dismiss[163] are DENIED;

- Defendants City of Cleveland, Cipo, and Kovach's motion for summary judgment[164] is GRANTED IN PART and DENIED IN PART;

- Defendant CMHA's motion for summary judgment[165] is GRANTED IN PART and DENIED IN PART;

- Defendants Imes, Morgan, Jakub, and Donaldson's motion for summary judgment[166] is GRANTED IN PART and DENIED IN PART; and

- Defendants' prior motions to dismiss[167] are DENIED AS MOOT.

Therefore, Count I (due process), Count III (Sixth Amendment), and Count V (conspiracy) survive

---

[162]/Doc. 65-10, at 61.

[163]/Docs. 39, 40, and 43.

[164]/Doc. 55.

[165]/Doc. 53.

[166]/Doc. 54.

[167]/Doc. 19, 20, and 28.

Case No. 1:12-CV-753
Gwin, J.

against Defendants Cipo and Kovach; Count II (malicious prosecution), Count VII (state-law malicious prosecution), and Count IX (IIED) survive against Defendants Cipo, Kovach, and Donaldson.  All other claims are dismissed.  The case will proceed to trial as assigned on March 4, 2013.

   IT IS SO ORDERED.


Dated: February 25, 2013      s/   *James S. Gwin*    
                JAMES S. GWIN
                UNITED STATES DISTRICT JUDGE